**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **PAUL THOMAS** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Civil Action File No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KAINOS WORKSMART INC.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendant.* | ) | |
| | ) | |
| | ) | |

**COMPLAINT**

Paul Thomas ("Plaintiff") files this Complaint against Defendant Kainos Worksmart Inc. ("Kainos" or "Defendant"). Plaintiff respectfully shows this Court as follows:

**<u>INTRODUCTION</u>**

1.     This action is for sexual orientation discrimination and retaliation arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII") as well as racial discrimination and retaliation arising under 42 U.S.C. § 1981 ("Section 1981"). Plaintiff seeks declaratory and injunctive relief, back pay, reinstatement or front pay in lieu of reinstatement, compensatory damages, punitive damages, liquidated damages, and attorney's fees and costs.

1

**JURISDICTION AND VENUE**

2.  Plaintiff's Section 1981 claims as well as his Title VII claims present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3).

3.  Venue is appropriate in this Court as upon information and belief the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and upon information and belief all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

**PARTIES**

4.  Plaintiff is a resident of the State of Georgia.

5.  Defendant is a foreign for-profit company registered to conduct business in the state of Georgia.

6.  Defendant transacts business in the Northern District of Georgia.

7.  Defendant is subject to this Court's jurisdiction. Defendant may be served through its registered agent if service of process is not waived:

Registered Agent Name: **C T CORPORATION SYSTEM**
Physical Address: **289 S CULVER ST, LAWRENCEVILLE, GA, 30046-4805, USA**
County: **Gwinnett**

## ADMINISTRATIVE PROCEEDINGS

8.     On February 17, 2023, Plaintiff filed a timely charge with the Equal Employment Opportunity Commission ("EEOC").

9.     On April 26, 2024, Plaintiff received a notice of right to sue from the EEOC.

10.     Plaintiff has exhausted his administrative remedies prerequisite to the filing of this suit pursuant to Title VII.

11.     This lawsuit has been filed within 90 days of Plaintiff's receipt of his notice of right to sue.

## STATEMENT OF FACTS

12.     Kainos is a global IT provider with expertise in Digital Services, Workday Services, and Workday Products.

13.     During all time relevant to this lawsuit, Defendant employed more than fifteen (15) employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

14.     Defendant is subject to the anti-discrimination and anti-retaliation provisions of Title VII.

15.     Plaintiff is male.

16.     Plaintiff is homosexual.

17. Plaintiff is African American.

18. Plaintiff's voice and mannerisms make it clear to most people that he is gay.

19. Plaintiff was an employee of Defendant at all times material to this Complaint.

20. Plaintiff began employment with Defendant on or about April 4, 2022.

21. Plaintiff was hired as a Workday Payroll Consultant.

22. Plaintiff was responsible for supporting the Senior Workday Payroll Consultant Lead through the various stages of the Workday Implementation Lifecycle.

23. For an employee to be a Workday Payroll Consultant, he or she must maintain a Workday certification.

24. During the first four to six weeks of Plaintiff's employment with Kainos, he had to get re-certified.

25. Upon hire, Plaintiff reported to Karl Tarrant (Caucasian) ("Mr. Tarrant").

26. Plaintiff worked from home, but he often had to interact with Mr. Tarrant and other co-workers via video conferences. During these conferences Mr.

Tarrant saw that Plaintiff was black.  Further, Plaintiff's mannerisms and voice made it clear to Mr. Tarrant and others whom he interacted with that he was gay.

27.    In early June 2022, Mr. Tarrant asked Plaintiff to work on a non-Workday Payroll ticket that was part of the AMS Workday Post-Production Support department, a different department than Plaintiff was hired into.

28.    After reading the ticket, Plaintiff realized that it was not a payroll inquiry and the knowledge required to answer the ticket was outside of Plaintiff's role.

29.    Similarly situated non-gay and/or non-African American employees were not assigned tickets in unrelated areas.

30.    Plaintiff confirmed with a Workday Payroll Trainer, Marzetta Terry (African American) ("Ms. Terry") that the ticket was not a payroll inquiry.

31.    Plaintiff showed Mr. Tarrant the research he had done and informed him that he did not have the background and skillset required to complete the ticket.

32.    This apparently upset or offended Mr. Tarrant.

33.    On or about July 20, 2022, Mr. Tarrant scheduled a meeting with Plaintiff.

34.    When Plaintiff joined the meeting, he realized that the VP over the Human Capital Management ("HCM") division, Veronica White ("Ms. White") (Caucasian Female) was also on the call.

35.    Ms. White began to reprimand Plaintiff for not resolving the AMS Workday Post-Production Support ticket from June.

36.    Plaintiff was caught off-guard and was confused since he'd informed Mr. Tarrant after the ticket was assigned that it was not in his skillset or background and should not have been assigned to a payroll consultant.

37.    Ms. White apologized and stated that she did not know that Plaintiff came from a background of payroll implementation or that the ticket that was assigned was not a payroll-related inquiry.

38.    Plaintiff felt that Mr. Tarrant coordinated the meeting with Ms. White and then clearly failed to give her the background of the ticket, using it as an intimidation and bullying tactic.

39.    After this meeting, Plaintiff made complaints of both race and homosexual discrimination.

40.    In or around July or August 2022, Mr. Tarrant assigned Plaintiff to a project to help support a testing tool known as "Smart," which was, again, a separate

department from the payroll implementation department where Plaintiff was assigned.

41.     Plaintiff again had no prior knowledge of or training on the Smart tool but was assigned to support Trish Witman ("Ms. Witman") (Caucasian) , the lead of the project.

42.     Again, similarly situated non-gay and/or non-African American employees were not assigned tickets in unrelated areas.

43.     During the period between July and October 2022 when Plaintiff was assigned to assist Ms. Witman with the Smart tool, he also had frequent doctor appointments due to some abnormal cardiac tests.

44.     Mr. Tarrant was aware of Plaintiff's medical appointments.

45.     Plaintiff began to experience a great deal of stress about the Smart team.

46.     For example, the project manager, "Annette," (Caucasian) often scheduled last minute meetings that conflicted with Plaintiff's other job duties as well as some of his medical appointments.

47.     There was also no training or support for Plaintiff on the Smart tool, and when either Plaintiff or Ms. Witman reached out for assistance or training, Annette would respond to them in a rude and dismissive manner.

48.    Upon information and belief, similarly, situated non-gay and/or non-African American employees were not treated similarly.

49.    In fact, on August 11, 2022, Ms. Witman emailed Mr. Tarrant explaining her frustrations and the issues that the Smart tool team were facing.

50.    As a result, Plaintiff asked Mr. Tarrant if he could be removed from the Smart tool testing team.

51.    Again, upon information and belief, similarly situated non-gay and/or non-African American employees allowed to move teams while Plaintiff was not.

52.    Between September 2 and September 5, 2022, Plaintiff was on vacation.

53.    Due to the challenges facing the airline industry during the pandemic, Plaintiff's flight home was canceled.

54.    While waiting for another flight, he worked remotely from the airport and let Mr. Tarrant know his status.

55.    Plaintiff had no meetings on his calendar for that day and was a work-from-home employee, so he did not anticipate any challenges with working from the airport while his travel home was in flux.

56.    Plaintiff recalls getting a message from Ms. Witman that on Friday, while Plaintiff was out on PTO, she had to assist the data integration team.

57.     Plaintiff reached out to the data integration representative to let him know that he could ask Plaintiff if he needed assistance or needed to schedule a meeting.

58.     The data integration representative did not reach out to Plaintiff for any assistance.

59.     Later that day, Mr. Tarrant scheduled a meeting with Plaintiff for the following day, Tuesday, September 7.

60.     In the meeting, Mr. Tarrant stated that Plaintiff had to work "core business hours" of 10:00 AM to 4:00 PM EST.

61.     Plaintiff was confused because he had never been told previously about "core business hours" and generally began work far earlier than 10:00 AM depending on his clients' needs.

62.     Mr. Tarrant also stated that the meeting was being held since Plaintiff was unavailable while he was at the airport the previous day.

63.     Plaintiff stated that he was available, had his laptop, and did not have any meetings scheduled.

64.     Mr. Tarrant then stated that Plaintiff was unavailable to help the data integration representative.

9

65.    Plaintiff responded that the data integration representative needed help on Friday while Plaintiff was out on approved PTO and that he sent the representative a message on Monday if he had questions.

66.    Plaintiff felt that Mr. Tarrant was personally attacking him due to his race and sexual orientation regarding the core business hours because he knew of similarly situated coworkers who did not work those hours.

67.    In fact, Plaintiff was asked by a colleague, Anna Kay Thompson ("Ms. Thompson"), what time was the best time to work.

68.    Plaintiff told her she should ask Mr. Tarrant, and Ms. Thompson stated that Mr. Tarrant told her he did not care what time she logged in.

69.    Ms. Thompson said she usually started work between 10:30 and 11:30 AM EST even though Plaintiff had been told he had to abide by the core business hours.

70.    Plaintiff informed Mr. Tarrant that he was going to reach out to HR because he felt bullied, harassed, and discriminated against due to race and sexual orientation.

71.    On September 8 and 9, 2022, Plaintiff received three negative performance reviews in his HR file from the directors of each project that he was assigned to.

72.     For example, Robert Young ("Mr. Young") (Caucasian), Director of the AMS Post-Production Department, left Plaintiff negative feedback concerning the ticket that had been assigned to him in June that was not a payroll implementation ticket.

73.     Mr. Young reprimanded Plaintiff for categorizing the time he spent on the ticket under the incorrect billing code, even though at the time, Plaintiff was a new employee and had not been given the correct billing code by Mr. Tarrant.

74.     Additionally, Plaintiff never interacted with Mr. Young at all.

75.     Instead, he kept Mr. Tarrant informed of the status of the ticket as well as the confirmation that it should not have been assigned to the payroll team to begin with.

76.     David Beazley ("Mr. Beazley") (Caucasian), the director of the SMART testing department, left feedback stating that Plaintiff was not attending meetings.

77.     Plaintiff had previously informed Mr. Tarrant of the concerns he had about the SMART team since Annette frequently scheduled last-minute meetings that conflicted with his other job responsibilities and/or medical appointments.

78.     Finally, Mr. Tarrant left Plaintiff negative feedback concerning Plaintiff not working core business hours and not being available on September 6,

the day his flight was canceled, despite Plaintiff having previously told him that was not the case.

79. Mr. Tarrant also stated in his feedback that Plaintiff missed an IBM Smart Tool meeting in July of 2022.

80. However, Plaintiff was not required to be at that meeting since it was an internal IBM client meeting that it was not mandatory for consultants to attend.

81. Additionally, the meeting was never placed on Plaintiff's calendar.

82. Prior to receiving the feedback from Mr. Young, Mr. Beazley, and Mr. Tarrant within a 48-hour period, Plaintiff had never been written up, received any corrective action, or placed on a performance plan.

83. In late October/early November 2022, Plaintiff was moved from Mr. Tarrant's team to the AMS Post-Production team under Chris Pascoe ("Mr. Pascoe") (Caucasian).

84. Plaintiff had never received additional training on the AMS Post-Production competencies so he was confused by this move.

85. In early January 2023, Plaintiff met with Mr. Pascoe.

86. Plaintiff recalled the meeting primarily being about Plaintiff needing to be more billable and to close tickets more quickly.

87. Plaintiff also recalled that during the meeting, Mr. Pascoe started to tell him what Ms. Witman told Mr. Pascoe about Plaintiff and then abruptly stopped.

88. When Plaintiff asked Mr. Pascoe to tell him, Mr. Pascoe said to forget he mentioned it.

89. Plaintiff felt very uncomfortable after that and reached out to Lauryn Evdokimov ("Ms. Evdokimov") in HR, again informing her that he felt he was being singled out and treated unfairly due to his race and sexual orientation.

90. Later that week, Plaintiff realized that even though he now reported to Mr. Pascoe, he was still under Mr. Tarrant's organization.

91. Plaintiff then emailed Ms. Evdokimov and requested to be moved to another supervisor because of the harassment, discriminatory, and retaliatory behavior shown by Mr. Tarrant.

92. Ms. Evdokimov stated that she would relay Plaintiff's request to the new HR People Partner, "Roger," and that Roger would contact him.

93. Plaintiff never heard from Roger.

94. Soon after, beginning on or around February 6, 2023, Plaintiff began to feel even more that Mr. Tarrant was attempting to "sabotage" his performance through Mr. Pascoe and Mr. Young.

95. For example, Plaintiff began to be assigned critical tickets back-to-back.

96. At the same time, Mr. Young's subordinate managers were repeatedly messaging Plaintiff asking him to pick up tickets.

97. Mr. Pascoe then stated he wanted to meet with Plaintiff and in the meeting, he made Plaintiff feel like he couldn't keep up with his workload.

98. Mr. Pascoe told Plaintiff to only spend one hour researching and testing each ticket, which Plaintiff knew was insufficient time.

99. Similarly situated non-gay and/or non-African American employees were not expected to complete similar tasks in one hour.

100. Plaintiff then checked the case ticketing system and noticed that he was the only consultant being assigned back-to-back tickets.

101. Not only that, Plaintiff noticed that some other consultants had not been assigned any tickets that week.

102. Plaintiff emailed Ms. Evdokimov the evening of February 9th, 2023, to make another complaint of harassment, bullying, discrimination, and retaliation.

103. Plaintiff also emailed Mr. Pascoe to ask if he was assigning work performance requests equally but never received a response.

104. On or about February 13, 2023, Plaintiff emailed Ms. Evdokimov a final time stating that he felt like he was being discriminated against for his race and sexual orientation because of the continued harassment and unfair treatment.

105. Ms. Evdokimov never replied to Plaintiff's email or addressed his discrimination complaints.

106. On or about February 16, 2023, Plaintiff received a message from one of Mr. Young's subordinate managers, Nicole Ast ("Ms. Ast") asking Plaintiff if he was going to get "this SLA."

107. Plaintiff replied to Ms. Ast that because he was still relatively new to the AMS team, he did not know what SLA meant.

108. Ms. Ast responded that he had been on the team long enough and should know what it meant and explained that it meant it was time sensitive ticket based on the Service Level Agreement (SLA).

109. Similarly situated non-gay and/or non-African American employees were not expected to know such jargon within the time frame that Plaintiff was expected to know it.

110. Plaintiff told Ms. Ast that the only ticket he saw was for the YMCA.

15

111. Ms. Ast stated that the SLA ticket had been assigned to him the previous day, and when Plaintiff checked, he found that it had been assigned to him after hours.

112. Plaintiff was confused as to why it was assigned to him instead of a colleague with a later work schedule if it was time sensitive.

113. During his conversation with Ms. Ast, Plaintiff received a meeting invite for the next day from Mr. Pascoe.

114. During that meeting on February 17, 2023, Plaintiff was terminated by Roger and Mr. Pascoe.

115. Mr. Pascoe tried to claim that the reason for his termination was that Plaintiff had performance issues.

116. Plaintiff knew that was not the case since he had no disciplinary record and the only negative feedback in his file all happened within a 48-hour period after he made a complaint of harassment and retaliation against Mr. Tarrant in September of 2022.

117. Plaintiff believes this was pretextual and he was terminated in retaliation for making complaints of discrimination and retaliation based on both his race and his sexual orientation.

## COUNT I
## DISCRIMINATION ON THE BASIS OF SEXUAL ORIENTATION IN VIOLATION OF TITLE VII

118.  Plaintiff incorporates by reference the preceding Paragraphs as if fully restated herein.

119.  As detailed above, throughout his employment with Defendant, Plaintiff was subjected to discrimination, harassment, and a hostile work environment by Ms. Shunkwiler and other employees simply because of his sexual orientation.

120.  All the above conduct was unwelcome and offensive to Plaintiff as well as open and obvious in the workplace.

121.  Plaintiff complained that the conduct was unwelcome, offensive, and created a hostile work environment.

122.  Defendant willfully and wantonly disregarded Plaintiff's rights. Additionally, Defendant's discrimination and retaliation against Plaintiff was undertaken in bad faith and constitutes unlawful, intentional gender discrimination in violation of Title VII.

123.  As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits (past and future), humiliation, and other indignities. Plaintiff seeks all damages available.

17

124.   Plaintiff seeks all remedies available by law or equity.

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

125.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

126.   Plaintiff is a member of a protected class (African American).

127.   Plaintiff was employed by Defendant at all times material to this Complaint.

128.   Plaintiff was qualified for the position he held.

129.   Plaintiff was subjected to race discrimination and was subjected to disparate treatment by Defendant in the terms and conditions of his employment as described above.

130.   This disparate treatment was because of Plaintiff's race and in violation of Section 1981.

131.   Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's discrimination against Plaintiff was undertaken in bad faith.

132.   Defendant failed to take prompt and appropriate remedial measures to stop or cure the aforementioned discrimination.

133.   As a direct and proximate result of Defendant's unlawful discriminatory actions, Plaintiff has suffered lost wages and other benefits of

employment, significantly diminished employment opportunities, inconvenience, loss of income, and emotional distress, including but not limited to outrage, shock, and humiliation.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII AND SECTION 1981

134.   Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

135.   Plaintiff engaged in protected activities protected under Title VII and Section 1981 by making complaints of discrimination on the basis of sexual orientation and race.

136.   As a result of his complaints of harassment, Plaintiff suffered adverse employment actions including being assigned work in a disproportionate manner, being required to work certain hours that other similarly situated employees were not required to work, being written up repeatedly in a 48-hour period and being terminated.

137. As a direct and proximate result of Defendant's unlawful discriminatory and retaliatory actions, Plaintiff has suffered lost wages and other benefits of employment, significantly diminished employment opportunities, inconvenience, loss of income, and emotional distress, including but not limited to

19

outrage, shock, and humiliation because he exercised his rights under Title VII and Section 1981.

138. Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's discrimination and retaliation against Plaintiff was undertaken in bad faith.

139. As a result, Plaintiff is entitled to both equitable and monetary relief in all forms provided by law.

140. Plaintiff seeks all remedies available to him by law or equity.

**WHEREFORE**, Plaintiff demands an arbitration and the following relief:

(a)    cause process to issue;

(b)    issue a declaratory judgment that Defendant's acts, policies, practices, and procedures complained of herein violated Plaintiff's rights under Title VII and state law;

(c)    grant Plaintiff a permanent injunction enjoining Defendant, their officers, agents, successors, employees, attorneys, and those acting in concert with them, from engaging in any employment practice or policy which discriminates against the Plaintiff and others similarly situated because of the exercise of their rights under Title VII or because of their participation in this lawsuit;

(d)     grant Plaintiff judgment in her favor and against each Defendant under all Counts of this Complaint;

(e)     order Defendant to make the Plaintiff whole by providing for his out-of-pocket losses as well as back pay in an amount equal to the sum of any wages, salary, employment benefits or other compensation denied or lost as a result of Defendant's unlawful and discriminatory acts, together with interest thereon, all in an amount to be proven at trial;

(f)     grant to Plaintiff compensatory and punitive damages for Defendant's willful violations of Title VII;

(g)     grant to Plaintiff reasonable attorney's fees together with any and all other costs associated with this action as provided by Title VII and state law violations; and

(h)     grant Plaintiff all other damages including nominal damages, available by law.

(i)     grant such additional relief as this court deems proper and just.

Respectfully submitted on this 25th day of July, 2024.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
Attorney for Plaintiff

THE MIXON LAW FIRM

22

3344 Peachtree Street, Suite 800
Atlanta, Georgia 30326
Phone: 770-955-0100
steve@mixon-law.com